Richard Keith MAYO v. STATE of Arkansas

CR 98-1049                                      984 S.W.2d 801

Supreme Court of Arkansas
Opinion delivered February 4, 1999

*Arkansas Public Defender Commission*, by: *Teri L. Chambers*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

W H."Dub" ARNOLD, Chief Justice. On January 27, 1998, a jury convicted the appellant, Richard Keith Mayo, of the capital murder of his wife, Joyce Mayo. He was sentenced to life imprisonment in the Arkansas Department of Correction. Accordingly, our jurisdiction is authorized pursuant to Ark. Sup. Ct. Rule 1-2(a)(2) (1998). The appellant raises two points on appeal. First, Mayo argues that the trial court erred by denying him the right to represent himself at trial. Second, he contends that the trial court erred by failing to submit three non-model instructions to the jury that would permit the jury to consider, even after finding premeditation and deliberation, whether appellant was under the influence of extreme emotional disturbance for which there was reasonable excuse. Finding no merit in appellant's arguments, we affirm appellant's conviction and sentence.

The facts underlying this case are undisputed. During a police interview the day after the incident, Mayo confessed most

of the details of the crime. According to Mayo, he and his wife had been married for a short time, although they had been together for fifteen years and had two children. They recently relocated from Odessa, Texas, to Mena, Arkansas, in the hope of finding a house and a job. On August 1, 1997, Mayo and his wife arrived at a motel in Mena at about eight o'clock. At some point in the evening, the two began to argue and at approximately 3:00 a.m., Mayo stabbed his wife several times in the head with a double-edged knife. He admitted that he had no excuse for his actions, stated that he believed he deserved the death penalty, but claimed that Joyce had told him that she was going to leave. He told her that if he could not have her that nobody could. Following the incident, Mayo talked with his mother and brother and turned himself into the police.

Several witnesses at trial, including the appellant's friends and his brother-in-law, testified that Mayo had continuing problems in his marriage and that he was concerned that Joyce was having affairs. Mayo's suspicions included his former boss in Odessa, whose car Mayo ransacked in search of evidence, Mayo's own brother, and various other men. According to the witnesses' testimony, Mayo told them that he believed his wife was also having an affair with his current boss and that he believed that the man had a key to his home and some of Mayo's clothes in his truck.

None of the witnesses believed that Joyce was having an affair even though Mayo claimed that he had evidence of infidelities. For example, Mayo reported that he found a used condom and a coca-cola bottle filled with semen in his bedroom and another condom hidden in a hole in the wall. He also described an unsuccessful search for his keys and his later discovery of them as evidence that his wife's lover had the keys and returned them to the house during Mayo's absence. Mayo also found notes that he believed were encoded secret messages. Other examples of Mayo's evidence included his belief that Joyce secretly communicated with other women at Wal-Mart based on the color of lollipop they selected at the check-out line and his belief that the extra four-digit code at the end of his zip code was a sign that his wife had a private mailbox. Joyce's possession of a picture of Mayo's brother convinced him that they were having an affair. Witnesses

observed that the appellant was sad, depressed, and at times tearful as he related these concerns, but none perceived any indication that Joyce was actually having an affair.

Witnesses also testified about Mayo's continued frustration with his wife's poor housekeeping. One witness testified that the pet cat used piles of dirty clothes as its litter box and that visitors had to climb over the piles to get into the house. The dining table was covered with dirty newspapers, clutter, and spilled drinks that had to be pushed away to use the table. Also, one of the children's rooms and the hallway were soiled with dog excrement. The appellant's brother-in-law noted that the house was "filthy" and that on one occasion Mayo loaded up and hauled away from the apartment three pickup loads of trash, but the apartment returned to its former condition within one month. Mayo and Joyce were known to argue about the condition of the home but none of the witnesses believed that Mayo ever "fought" with Joyce or hit her as a result of these arguments.

During a visit to his mother's about a week before Joyce was killed, Mayo asked his mother for a shotgun to go quail hunting. Realizing that it was not quail season and fearing that he would hurt himself, she attempted to prevent Mayo from getting a gun. Joyce was also on the scene and talked him into returning the gun by telling him that he would not go to heaven if he shot himself. Following the scene, Mayo asked his mother and wife for help. His mother spoke with the sheriff about having Mayo committed and gave Joyce some phone numbers. However, no further action was taken and Mayo received no medical attention.

## I. Waiver of counsel

Appellant's first point on appeal assigns as error the trial court's failure to conduct an inquiry into his waiver of counsel, its denial of his right to represent himself, and its appointment of a public defender. The Sixth Amendment to the United States Constitution, made obligatory upon the states by the Due Process Clause of the Fourteenth Amendment, guarantees an accused the right to have the assistance of counsel for his defense. *Oliver v. State*, 323 Ark. 743, 918 S.W.2d 690 (1996); *Philyaw v. State*, 288

Ark. 237, 244, 704 S.W.2d 608 (1986) (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963); and *Slaughter & Scott v. State*, 240 Ark. 471, 400 S.W.2d 267 (1966)). Additionally, Article 2, section 10, of the Arkansas Constitution specifically provides that an accused in a criminal prosecution has the right to be heard by himself and his counsel. *Philyaw*, 288 Ark. at 244 (citing *Barnes v. State*, 258 Ark. 565, 528 S.W.2d 370 (1975)). Significantly, no sentence involving loss of liberty can be imposed where there has been a denial of counsel. *Philyaw*, 288 Ark. at 244 (citing *White v. State*, 277 Ark. 429, 642 S.W.2d 304 (1982)).

However, the constitutional right to counsel is a personal right and may be waived at the pretrial stage or at trial. *Philyaw*, 288 Ark. at 244 (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938); and *Barnes*, 258 Ark. 565). *See also Slaughter*, 240 Ark. 471; and *Childs v. State*, 243 Ark. 62, 418 S.W.2d 793 (1967). A defendant in a criminal case may invoke his right to defend himself pro se provided that (1) the request to waive the right to counsel is unequivocal and timely asserted, (2) there has been a knowing and intelligent waiver of the right to counsel, and (3) the defendant has not engaged in conduct that would prevent the fair and orderly exposition of the issues. *Philyaw*, 288 Ark. at 245 (citing *Barnes*, 258 Ark. 565). Notably, every reasonable presumption must be indulged against the waiver of fundamental constitutional rights. *Philyaw*, 288 Ark. at 244 (citing *Franklin & Reid v. State*, 251 Ark. 223, 471 S.W.2d 760 (1971)).

On appeal, Mayo alleges that he intended to voluntarily relinquish his right to counsel. At a preliminary arraignment hearing on August 6, 1997, the court asked Mayo whether he had obtained an attorney and also asked several questions to determine whether Mayo was financially able to hire an attorney. As a result of Mayo's responses, indicating that he did not have the resources to hire an attorney, the trial court appointed Randy Rainwater, a public defender, to assist Mayo. The judge noted that he would permit Rainwater to sit with the appellant for the rest of that hearing but would not formally appoint him pending the trial-court judge's determination at a later time. Despite this remark, there remained some confusion as to whether Rainwater was to con-

tinue as Mayo's appointed counsel or if he was to assist Mayo solely during the preliminary hearing.

Subsequently, on August 27, 1997, the trial court conducted a hearing to determine if Mayo had retained an attorney's services or if he desired a court-appointed attorney. The trial court also stayed all proceedings until the Arkansas State Hospital could perform a mental evaluation of Mayo. At that hearing, the following discussion relating to appellant's representation transpired:

COURT: Mr. Mayo, have you employed an attorney to represent you?

MAYO: No, sir, but could I have a request?

COURT: Well, keeping in mind that you've been advised not to say anything or that anything that you say will be used against you, do you understand that?

MAYO: Yes, sir.

COURT: What is your request?

MAYO: That it not be Randy Rainwater to be my lawyer.

COURT: Then who do you want me to appoint?

MAYO: I don't know, anybody but Randy Rainwater. He's got too big a case load.

COURT: Well, we're going to get some help the first of the year, but right now, I don't have any help and I don't have anyone else to appoint. Now, you can hire anyone you want to if you're able to.

MAYO: I'll just represent myself. I don't want a lawyer.

COURT: Well, I can't agree with you on that because the supreme court is going to require me to give you the services of a lawyer and quite frankly, you may need more than one lawyer when you're charged with a capital offense. So, I'm going to appoint Randy Rainwater, but I'm going to give you some help as time goes on. Now there's an order for an examination, forensic medical examination. That has to be done, also and when that's concluded and the report is received back, then I'll take up your request again at that time and see about getting another attorney. The matter cannot be set for trial until that examina-

tion has been completed. Right now, they're just waiting on them to say that they've got bed space for you. But, I'll get you another lawyer. As long as a capital charge is filed against you, we have a rule where we have to have two lawyers. When you come back [from the Arkansas State Hospital], we'll discuss this again.

The appellant contends that it was the trial court's duty to conduct an inquiry into the waiver issue when he remarked that he would represent himself and that its failure to do so denied him his constitutional right to conduct his own defense. The appellant notes that to establish a voluntary and intelligent waiver of that right, the trial court must explain to the accused that he is entitled as a matter of law to an attorney and that it must question the accused to determine if he can afford to hire a lawyer. The judge must also explain the importance of having an attorney's assistance during trial and the impediments of not having an attorney. *See Akins v. State*, 330 Ark. 228, 238, 955 S.W.2d 483 (1997).

Mayo asserts that the record demonstrates that he both timely and unequivocally asserted his right to defend himself. He also argues that the record is void of any conduct on his part that would prevent the fair and orderly exposition of the issues. Accordingly, he suggests that the only disputed issue is whether the waiver of counsel was knowing and intelligent. The determination of whether any defendant intelligently waived his right to counsel is dependent upon the particular facts and circumstances of the case. The accused must have full knowledge or adequate warning concerning his rights and a clear intent to relinquish them before a waiver can be found. *Philyaw*, 288 Ark. at 245 (citing *Barnes*, 258 Ark. 565).

Here, at a second hearing on September 17, 1997, the court discussed with Mayo his request that Rainwater be released as his attorney and that another attorney be appointed. Mayo agreed to a new appointment, reiterating his position that "It ain't nothing against Mr. Rainwater. He does have a pretty big case load." The record indicates that Mayo's desire not to be represented by Rainwater was due to his belief that Rainwater's caseload was too heavy and not to any personal or professional disagreement. Although the appellant's request to represent himself was timely made, it appears to be equivocal, given that he sought to have

other counsel appointed and that the only basis for his objection was Rainwater's caseload.

■ ■ Moreover, at the time of the second hearing Mayo had not yet been examined by the State Hospital to determine his competency to stand trial. The trial court did not find Mayo competent to stand trial until January 26, 1998, after it received the State Hospital's report. In *Godinez v. Moran*, 509 U.S. 389 (1993), the Supreme Court held that a defendant must be competent to waive his right to an attorney. The trial court must find whether the defendant is competent to elect self-representation by determining (1) whether the defendant is competent to stand trial, and (2) whether the waiver of the right to counsel is knowingly and intelligently waived. *Id.* Given that Mayo's competency was still an issue at the relevant hearings, the court could not have assessed whether the waiver was knowing and intelligent. In light of the equivocal nature of the waiver, the fact that the trial court could not determine whether the waiver was knowingly and intelligently made, and indulging every reasonable presumption against the waiver of fundamental constitutional rights, we affirm the trial court on this point.

■ Although the State concedes that a trial court's failure to conduct an inquiry may be reversible error, it argues that any such error in the instant case is harmless because Mayo subsequently requested appointed counsel and never objected to having counsel represent him at trial. We note that while we affirm the trial court, we disagree with the State's harmless-error analysis. The Supreme Court has held that the denial of the right of self-representation is not amenable to a harmless-error analysis because when that right is exercised it usually increases the likelihood of a trial outcome unfavorable to the defendant. According to the Supreme Court, the right is either respected or denied but its deprivation cannot be harmless. *See McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984).

## II.  Nonmodel jury instructions

Appellant's second point on appeal challenges the trial court's refusal to submit three "transitional" jury instructions that are not

contained in AMCI 2d. Mayo was charged with capital murder on the theory that he had the "premeditated and deliberate purpose" of causing his wife's death. Accordingly, the trial court instructed the jury on the capital-murder offense and on the lesser-included offenses of first-degree murder, second-degree murder, and manslaughter.

■ ■ The State correctly points out that it is not error for a court to refuse to give a nonmodel instruction when a model instruction accurately reflects the law. *See Williams v. State,* 329 Ark. 8, 946 S.W.2d 678 (1997). A trial court should give the jury a nonmodel instruction only when the model instructions fail to correctly state the law or if there is no model instruction on the subject. *Cavin v. State,* 313 Ark. 238, 855 S.W.2d 285 (1993). In the instant case, the model instructions matched the statutory language of each offense and properly stated the law. *See Misskelley v. State,* 323 Ark. 449, 915 S.W.2d 702 (1996). As a result, the jury was permitted to consider whether the appellant was acting under the influence of extreme emotional disturbance and guilty of a lesser-included offense.

■ In any event, the appellant has failed to cite any legal authority in support of his position, and this court does not consider arguments without authority or convincing argument where it is not apparent without further research that the argument is well-taken. *Morgan v. State,* 333 Ark. 294, 971 S.W.2d 219 (1998) (citing *Matthews v. State,* 327 Ark. 70, 938 S.W.2d 545 (1997)). Accordingly, we affirm the trial court on this point.

### III. Rule 4-3(h)

In accordance with Ark. Sup. Ct. R. 4-3(h) (1998), the record has been reviewed for adverse rulings objected to by the appellant but not argued on appeal, and no reversible errors were found. In light of the foregoing, we affirm the appellant's judgment of conviction.