Michael Douglas HATFIELD *v.* STATE of Arkansas

CR 01-285 57 S.W.3d 696

Supreme Court of Arkansas
Opinion delivered October 25, 2001
[Petition for rehearing denied December 6, 2001.*]

---

* BROWN, J., would grant.

*Henry & Cullen, L.L.P.*, by: *Mark Murphy Henry*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Misty Wilson Borkowski*, Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Michael Hatfield challenges his convictions for rape and kidnapping, for which he was sentenced to life in prison. On appeal, he does not challenge the sufficiency of the evidence. The point he argues is that the trial court erred in failing to obtain his knowing and intelligent waiver of his right to counsel and in permitting him to proceed *pro se* at trial. This appeal requires us to determine two issues: first, whether or not Hatfield waived his right to counsel; and second, whether he subsequently relinquished his right to self-representation by permitting his attorney to conduct portions of the trial.

Hatfield was charged by information with one count each of kidnapping and rape. The charges stemmed from the abduction of a twelve-year-old girl on September 3, 1999. The information was filed on September 10, 1999, and on September 14, 1999, the trial court appointed public defender Dave Harrod to represent Hatfield. At that time, Hatfield entered a plea of not guilty by reason of mental disease or defect and requested a mental evaluation. Harrod continued to represent Hatfield throughout a number of pretrial hearings, and at a hearing on August 1, 2000, Harrod again announced that they were ready for trial, which was scheduled for August 7, 2000. On August 4, 2000, however, Hatfield filed a letter with the circuit court in which he declared that he had "fired Dave Winslow Harrod as my public defender for conflict of interest and disagreement over trial and case management," and requested that the court appoint him a different public defender.

Hatfield's jury trial began on August 7, 2000. That morning, Harrod mentioned Hatfield's motion, and noted that the court had "indicated by order back to Mr. Hatfield that he either had to use the public defender he was assigned or represent himself." Harrod also said that Hatfield had "indicated . . . that what he'd like to do if at all possible . . . since he's unfamiliar with *voir dire* is for me to sit in and assist in the jury selection and then he would like to represent himself in open court with the jury." Hatfield agreed with this assessment of the situation, and after addressing several other motions, the court and counsel had the following exchange:

THE COURT: Well, you know even if we follow this procedure with you picking the jury then Mr. Hatfield proceeding with the trial. Then you'll be present during the entire trial and available so he can consult you as necessary. And also, you know, if he wants you to question any witnesses or do anything on his behalf. You're available to do that; you're going to be available stand-by.

MR. HARROD: Well, I didn't believe that I was going to be able to go fishing, Judge. My assumption was that if he's going to go ahead and do the trial himself so as not confuse him I can sit aside and if he needs to consult then he can ask the court for a moment and we can confer, and, and — and it should be an orderly process.

THE COURT: As long as you're available.

MR. HARROD: Yes, sir.

\* \* \* \*

MR. HARROD: Judge, I don't believe there's anything else that needs to be taken up with regard to the defense. And the defense would be prepared to go forward.

THE COURT: Anything else by the State?

PROSECUTOR: We'd ask for just a few minutes to find some cases on . . . the court relieving Mr. Harrod. *Because there are some questions and some steps that the supreme court has said that the court has to go through.*

THE COURT: *Well, he hasn't been relieved. It's just that . . .*

PROSECUTOR: *He just wants to try his own case.*

THE COURT: *Right.*

PROSECUTOR: And Mr. Harrod will be here to make objections and . .

MR. HARROD: Well, not exactly. I'll be here . . .

THE COURT: Right, and to consult with.

MR. HARROD: I'll — I'll be available if he's got a question and or if, you now, if there's some critical advice he needs, but I'm not going to interfere with his trying the case.

THE COURT: Or to proceed with the case if he so elects to allow you to do that.

MR. HARROD: Whatever, Judge. Yes, sir.

THE COURT: So you're still counsel on the case.

MR. HARROD: Yes, sir. I just — I just want [it] clear, Judge, that Mr. Hatfield's desire is to proceed with the case in his own fashion. *And his method does not match the defense method, and rather than appear at loggerheads I think his decision to go forward is — is reasonable. And I* — I think that sitting in a position where I can, you know, if he calls I can be of assistance. I don't mind doing that a bit. If there's any question that comes up on his part I don't mind answering that at all. This is not personal, it's just — just a —

THE COURT: Trial strategy.

MR. HARROD: *Trial strategy and case methodology management dis — disagreement.*

THE COURT: Anything further for the State?

PROSECUTOR: Your honor, there's not anything further as far as on the motions.

(Emphasis added.) After this exchange, attorney Harrod proceeded to conduct *voir dire*, which occupied the first day of trial. On the second day, Hatfield gave his own opening statement, and conducted cross-examination of six of the State's eleven witnesses who testified that day.[1]

 On appeal, Hatfield argues that he was not given the opportunity to knowingly and intelligently waive his right to counsel. The right of a criminal defendant to proceed *pro se* was delineated in *Faretta v. California*, 422 U.S. 806 (1975), where the

---

[1] While the dissent makes reference to Hatfield's "handl[ing] solely" eleven witnesses, the record shows that he only cross-examined six of those witnesses, asking no questions of the other five.

Supreme Court held that "in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits [traditionally associated with the right to counsel]." *Faretta*, 422 U.S. at 835. The Court further stated that, although a defendant need not have the skill and experience of a lawyer in order to competently and intelligently choose self-representation, he "should be made aware of the dangers and disadvantages of self-representation so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* (citing *Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942)). In *Faretta*, the Court also concluded that a defendant's technical legal knowledge, as such, is not relevant to an assessment of his knowing exercise of the right to defend himself.

Likewise, this court has long recognized the crucial aspect of informing an accused of his right to represent himself, along with the attendant risks. *See, e.g., Williams v. State*, 153 Ark. 289, 239 S.W. 1065 (1922); *Slaughter v. State*, 240 Ark. 471, 400 S.W.2d 267 (1966); *Barnes v. State*, 258 Ark. 565, 528 S.W.2d 370 (1975). Furthermore, our court has held that the trial court maintains a weighty responsibility in determining whether an accused has knowingly and intelligently waived his right to counsel. *Gibson v. State*, 298 Ark. 43, 764 S.W.2d 617 (1989) (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)); *Murdock v. State*, 291 Ark. 8, 722 S.W.2d 268 (1987). Every reasonable presumption must be indulged against the waiver of fundamental constitutional rights, *Daniels v. State*, 322 Ark. 367, 908 S.W.2d 638 (1995), and the burden is upon the State to show that an accused voluntarily and intelligently waived his fundamental right to the assistance of counsel. *Oliver v. State*, 323 Ark. 743, 918 S.W.2d 690 (1996). Determining whether an intelligent waiver of the right to counsel has been made depends in each case on the particular facts and circumstances, including the background, the experience, and the conduct of the accused. *Oliver*, 323 Ark. at 749; *Beyer v. State*, 331 Ark. 197, 962 S.W.2d 751 (1998).

A criminal defendant may invoke his right to defend himself *pro se* provided that (1) the request to waive the right to counsel is unequivocal and timely asserted, (2) there has been a knowing and intelligent waiver of the right to counsel, and (3) the defendant has not engaged in conduct that would prevent the fair and orderly exposition of the issues. *Collins v. State*, 338 Ark. 1, 991 S.W.2d 541 (1999); *Mayo v. State*, 336 Ark. 275, 984 S.W.2d 801 (1999). A specific warning of the dangers and disadvantages of self-representation, or a record showing that the defendant possessed

such required knowledge from other sources, is required to establish the validity of a waiver. *Bledsoe v. State*, 337 Ark. 403, 989 S.W.2d 510 (1999) (citing *Scott, infra*). The "constitutional minimum" for determining whether a waiver was knowing and intelligent is that the accused be made sufficiently aware of his right to have counsel present and of the possible consequences of a decision to forego the aid of counsel. *Scott v. State*, 298 Ark. 214, 766 S.W.2d 428 (1980) (quoting *Patterson v. Illinois*, 487 U.S. 285 (1988)).

Hatfield's argument in the instant appeal is that the trial court did not sufficiently advise him of the possible consequences of proceeding *pro se*. Indeed, it is apparent from the record that the trial court made no inquiry into Hatfield's understanding of the risks and dangers of representing himself, even though attorney Harrod volunteered to the court that Hatfield's "case methodology" did not match the "defense method." While an assessment of how well or poorly Hatfield mastered the intricacies of the law is not relevant to an assessment of his knowing exercise of the right to defend himself, *see Faretta, supra*, it is evident from the record that, from his conduct before and during trial, he could not have understood the disadvantages or risks he was about to undertake when assuming control of his own defense. Indeed, Hatfield's cross-examination of several of the witnesses reveals his lack of comprehension of the fundamentals of trial procedure. For example, his examination of the victim's mother was rambling, and much of it was irrelevant. The prosecutor objected repeatedly to his questioning, and Hatfield became increasingly flustered, at one point asking the court, in reference to the State's objections, "Is this going to be the entire trial? Object. Object. Object." Later in the day, as deputy sheriff Richard Houchin testified about photographs of footprints taken at the crime scene, Hatfield essentially incriminated himself during the following exchange:

> HATFIELD: Okay. And, ah, what about the tracks?
>
> HOUCHIN: I made no reference to whose footprints they were. That's a true statement.
>
> HATFIELD: Sure you did. Sure you did. I've got a — I've got lab number . . . 9912060391K87. What that is — is a copy of my left and right shoe print.

██ Clearly, Hatfield was unaware of the fundamentals of trial strategy, nor was he aware as to how to conduct cross-examination of the witnesses. Since Hatfield never intended to offer

witnesses in his own defense, and his entire case was dependent upon the cross-examination of the State's witnesses, the trial court should have made Hatfield aware of the dangers and disadvantages in representing himself, as required by *Faretta*. In prior cases, this court has held that the trial court's failure to make such an inquiry constituted reversible error. *See, e.g., Daniels v. State*, 322 Ark. 367, 908 S.W.2d 638 (1995); *Scott v. State*, 298 Ark. 214, 766 S.W.2d 428 (1989); *Gibson v. State*, 298 Ark. 43, 764 S.W.2d 617 (1989). Here, because the trial court allowed stand-by counsel to remain in the case, it did not make even a limited inquiry into the defendant's understanding of the legal process before permitting Hatfield to represent himself. This was clearly error on the trial court's part.

The State, however, urges this court to conclude that, even if the trial court failed to conduct the relevant inquiry, there was still no reversible error because Hatfield effectively relinquished representation to his standby counsel. In other words, the State contends that any deficiencies in the trial court's *Faretta* inquiry were rendered moot by attorney Harrod's active participation throughout the trial, and Hatfield thereby waived his right to proceed *pro se*. The State points out that Harrod conducted each of the thirteen pretrial hearings in this case. At most of these hearings, Harrod requested continuances, and on March 14, 2000, Harrod announced that he was ready for trial as soon as the State finished producing evidence. At the May 9, 2000, pretrial hearing, Harrod took up a number of motions for Hatfield, including a request that he not be made to go to trial in prison clothing and a motion requesting individual *voir dire*. Harrod also spent a good deal of time at the May 9 hearing discussing the State's DNA evidence and the fact that the FBI had not been forthcoming in their test results, and, on the first day of trial, Harrod engaged in *voir dire* on Hatfield's behalf. While Hatfield conducted the second day of trial, cross-examining a number of the State's witnesses that day, on the third day, however, Hatfield became ill and asked the court if Harrod could continue the trial for him, as follows:

> MR. HATFIELD: Your Honor, I've . . . come down sick. . . . [I]nstead of postponing the trial and going to the doctor I can . . . get a trash can over here in case I have to throw up and I'm requesting that Dave [Harrod] continue the rest of the trial. Ah, we have no — we had no disagreement as far as legal procedures from this point on. It's just the DNA and the hair samples and maybe a few other witnesses. No problem there. And we just go ahead and resolve this today or tomorrow whenever it's going to be over.

THE COURT: Okay. The court will allow Mr. Harrod to proceed then since you all are acting as co-counsel together.

MR. HATFIELD: Okay. Is that okay with you?

MR. HARROD: Your Honor, if . . .

PROSECUTOR: Do what the judge tells you.

MR. HATFIELD: Okay.

MR. HARROD: . . . if that's going to be the case, . . . counsel was informed of this about four minutes before trial started. Ah, the records that I have are not laid out or set up, ah, for the witnesses coming in. I'd ask for a twenty minute recess to get set up.

THE COURT: Yes, the court will permit you to get your stuff set up then.

Harrod finished the rest of the trial, cross-examining four of the nine witnesses called by the State that day, including the DNA experts — who offered the most conclusive evidence regarding Hatfield's guilt — and moving for a directed verdict at the close of the State's case. That motion was denied, and Harrod rested the defense's case without calling any witnesses. He again moved for a directed verdict, and it was once more denied. Harrod also offered several proposed jury instructions to the court, and delivered the closing argument. Harrod asked to poll the jury when it returned with its verdict, raised objections to testimony offered by one of the State's witnesses during the sentencing phase, informed the court that Hatfield would not call any sentencing witnesses, and offered a closing argument to the jury at the sentencing phase.

 These circumstances bring us to the State's counterargument: did Hatfield relinquish his representation to attorney Harrod? The State submits that once a defendant invokes his right to self-representation, he may subsequently waive that right when he "invites or agrees to any substantial participation by [stand-by] counsel." See McKaskle v. Wiggins, 465 U.S. 168 (1984); see also United States v. Heine, 920 F.2d 552 (8th Cir. 1990). Also in support of this argument, the State cites Oliver v. State, 323 Ark. 743, 918 S.W.2d 690 (1996), and Calamese v. State, 276 Ark. 422, 635 S.W.2d 261 (1982). In Oliver, this court held that the trial court's failure to inquire into Oliver's financial ability to hire counsel was error, but

still concluded that, because the stand-by counsel provided active representation of the defendant, it would be "hard put to hold that Oliver was denied his right to counsel." *Oliver*, 323 Ark. at 751-52. Likewise, in *Calamese*, the defendant repeatedly asserted to the trial court that she wanted to proceed *pro se*, and the record was in fact silent as to whether or not the trial court inquired into attempted waiver of counsel. However, Calamese's "stand-by" attorney immediately assumed an active role as her trial attorney, examining all of the witnesses, making objections to evidence, and presenting a lengthy defense. This court held that the trial court's error in failing to conduct an inquiry was rendered moot by Calamese's subsequent relinquishment of the trial to her attorney.

We agree with the State's arguments. We note that in *Bledsoe v. State*, 337 Ark. 403, 989 S.W.2d 510 (1999), we held that the question of whether or not the assistance of stand-by counsel rises to a level where the defendant is deemed to have had counsel for his defense, thereby mooting any assertion of involuntary waiver, is a question that must be answered by looking at the totality of the circumstances. *Bledsoe*, 337 Ark. at 410 (citing *Oliver, supra*; *Wicoff v. State*, 321 Ark. 97, 900 S.W.2d 187 (1995)). Our cases on this issue demonstrate that the assistance must be substantial, such that counsel was effectively conducting a defense. *Id.* (citing *Oliver, supra*, and *Calamese, supra*).

In *Bledsoe*, this court first held that the trial court erred in failing to explicitly inform the defendant of his constitutional right to an attorney.[2] However, the State in that case, as it does here, argued that, even if the trial court failed to inform the defendant of the risks of proceeding *pro se*, there was still no error because Bledsoe relinquished representation to his stand-by counsel. The *Bledsoe* court disagreed. There, counsel did not actively participate in the defense during most of the trial; Bledsoe, rather than his lawyer, cross-examined twenty-four of the State's twenty-five witnesses, raised and argued the only substantive objections during the trial, and presented his own closing argument. While counsel conducted *voir dire* and gave the opening statement, this court held that the attorney "effectively relinquished" representation to Bledsoe once the State began to call witnesses. Further, although counsel's participation increased at the end of Bledsoe's trial, when he

---

[2] Although the court warned Bledsoe that he would have to conform to the rules and procedures of the court, the court did not explain the consequences of failing to comply with those rules. Thus, this court concluded that Bledsoe did not knowingly and intelligently waive his right to counsel.

reviewed the jury instructions and handled the sentencing phase, this court maintained that Bledsoe was essentially left to represent himself during most of the proceedings.

■ Here, Hatfield's trial performance only included opening statement and cross examination of six witnesses; however, every other stage of the defense was handled by counsel, Harrod. While the dissenting opinion goes to some length in assessing Hatfield's deficiencies in presenting his defense, such deficiencies are not relevant to a *Faretta* inquiry, nor are they relevant when deciding whether he relinquished his representation to Harrod and whether Harrod's representation or assistance was substantial. To summarize, Harrod handled all pretrial matters, including thirteen hearings, a full day of *voir dire* of the jury, the cross examination of four state witnesses (including the DNA experts), moving for directed verdict, making closing argument, offering proposed jury instructions, raising objections, and making closing argument at the sentencing stage of trial. Unquestionably, Harrod, at Hatfield's request, provided Hatfield effective substantial legal assistance in conducting his defense. Certainly, Harrod could have been in a better position to present Hatfield's defense if Hatfield had not chosen to make an attempt to proceed *pro se*; nonetheless, when it came to the actual presentation of his case, he relinquished full discretion to Harrod as to how to conduct significant trial procedures and responsibilities during two of the three days of trial.

The record in this case has been reviewed for other reversible error in accordance with Ark. Sup. Ct. R. 4-3(h), and none has been found. For the aforementioned reasons, the judgment of conviction is affirmed.

BROWN, IMBER, and THORNTON, JJ., concur in part and dissent in part.

ROBERT L. BROWN, Justice, concurring in part; dissenting in part. I agree with the majority that it was error for the trial court not to inquire into Hatfield's understanding of the legal process and the serious implications of self-representation. Thus, I, too, conclude that there was no knowing or intelligent waiver of his right to counsel. *See Faretta v. California*, 422 U.S. 806 (1975); *Bledsoe v. State*, 337 Ark. 403, 989 S.W.2d 510 (1999).

Where I part company with the majority is on whether Hatfield, after he decided to represent himself, relinquished his representation to standby counsel, Dave Harrod. The test for this

determination is whether standby counsel's assistance at trial was substantial such that counsel was effectively conducting a defense. *Bledsoe v. State, supra*; *Oliver v. State*, 323 Ark. 743, 918 S.W.2d 690 (1996); *Calamese v. State*, 276 Ark. 422, 635 S.W.2d 261 (1982). While Dave Harrod did assist as counsel for *voir dire* and the third day of the trial, I cannot conclude that he effectively conducted a defense. Accordingly, this case turns on whether Hatfield knowingly and intelligently waived his right to counsel. As already stated, I do not believe he did.

What the trial court created in this case was a hybrid situation. Harrod was not relieved as counsel. Yet Hatfield was allowed to try his own case because his defense strategy differed from that of his standby counsel's:

> THE COURT: So you're still Counsel on the case.
>
> STANDBY COUNSEL: Yes, sir. I just — I just want to [be] clear, Judge, that Mr. Hatfield's desire is to proceed with the case in his own fashion. And his method does not match the Defense method and rather than appear at loggerheads I think his decision to go forward is — is reasonable. And I — I think that sitting in a position where I can, you know, if he calls I can be of assistance. I don't mind doing that a bit. If there's any question that comes up on his part I don't mind answering that at all. This is not personal it's just — just a —
>
> THE COURT: Trial strategy.
>
> STANDBY COUNSEL: Trial strategy and case methodology management dis — disagreement.

The result was that Hatfield represented himself in opening statement and through the first eleven witnesses. The results were catastrophic as evidenced by Hatfield's admission that his footprints were at the crime scene:

> HATFIELD: Okay. And, ah, what about the tracks?
>
> DEPUTY SHERIFF: I made no reference to whose footprints they were. That's a true statement.
>
> HATFIELD: Sure you did. Sure you did. I've got a — I've got lab number 991202, ah, 9912060391K87. What that is — is a copy of my left and right shoe print.

At trial, Hatfield questioned all of the State's witnesses until the third day of the trial. All told, there were twenty-one witnesses. Of those witnesses, eleven were handled solely by Hatfield. Those eleven witnesses included seminal witnesses for the prosecution, including forensic witnesses:

- Cordellia Ireland, victim's mother;
- State Police Trooper Dustin Rogers, regarding arrest;
- FBI Agent Daniel Wehr, regarding 29 exhibits from crime scene;
- Sheriff Detective Jack Allen, regarding fingerprints;
- Sheriff Detective Terry Ward, regarding rape exam;
- FBI fingerprint specialist, Kenneth Dunn, regarding fingerprints;
- Sheriff Deputy Lonnie Massey, regarding transporting victim to hospital;
- Sheriff Deputy Richard Houchin, regarding chain of custody for crime scene exhibits (20 exhibits admitted without objection);
- Medical Resident Gwynetta Collins, regarding rape kit and rape exam;
- FBI Lab Instructor Monica Knuckles, regarding chain of custody; and
- State Police Criminal Investigator Lorelei Sellers, regarding victim interview and condition.

It was the forensic evidence that was most damning in Hatfield's case. Hatfield, of course, knew nothing about chain of custody, the handling of a rape kit, fingerprint matchups, or specialized scientific forensic testimony that the State adduced during the time Hatfield was at the helm of his own defense. As a result, I am hard-pressed to conclude that standby counsel effectively conducted a defense. Not only did he not make the opening statement or cross-examine the State's first eleven witnesses, he called no witnesses for the defense at all.

The majority relies heavily on the *Oliver* and *Calamese* cases, but the facts in those cases are easily distinguishable from the facts of this case. This court observed in the *Bledsoe* decision:

> In *Calamese, supra,* there was no evidence of any inquiry by the trial court into the appellant's attempted waiver of counsel, but we determined that the appellant had been effectively represented at trial by the attorney appointed to assist her. We noted that the attorney "immediately assumed a fully active role as trial attorney,

conducting the entire interrogation, cross-examination, making objections to evidence and exhibits, presenting a defense with numerous exhibits and four defense witnesses, including eliciting lengthy testimony from the defendant and making a forceful closing argument, all of which was done with evident familiarity." *Id.* Under those facts, we held that appellant was not left to represent herself at any stage of the proceedings, and she was not denied her right to counsel. *Id.*

Similarly, in *Oliver, supra,* no effective waiver was obtained when the defendant elected to proceed *pro se* and standby counsel was appointed to assist during trial. As in *Calamese,* we affirmed the conviction where, with the exception of the defendant's cross-examination of the first State witness, standby counsel cross-examined each State witness, made objections during the State's case, and presented a motion for directed verdict at the conclusion of the State's case. *Id.* Further, standby counsel recalled the State's first witness and examined him as well as the remaining six defense witnesses. *Id.* Counsel also made the closing argument. *Id.* Under such circumstances, we held that the defendant was not denied his right to counsel because standby counsel not only advised the defendant but "actively represented him during *most* of the proceeding," and the defendant "effectively relinquished representation to his standby counsel" early in the trial. *Id.* (emphasis added).

*Bledsoe,* 337 Ark. at 410-11, 989 S.W.2d at 514.

Mounting a substantial and effective defense means more than cross-examining State witnesses the third day of the trial. In *Calamese,* defense counsel presented numerous witnesses and exhibits, made objections throughout the trial, and put the defendant on the stand. There can be little doubt that in *Calamese,* the standby counsel actively pursued a defense. Likewise, in *Oliver* standby counsel called six defense witnesses, recalled one of the State's witnesses, and made objections throughout the State's case. Looking at *Calamese* and *Oliver,* it is apparent from an inspection of those facts that defense counsel was involved in both cases sufficiently to have formed and implemented a defense strategy.

In sum, Hatfield chose to represent himself, but he did so without being made sufficiently aware by the trial court of the dangers and disadvantages of self-representation. *See Faretta v. California, supra.* Thus, the record in this case fails to establish that he knew what he was doing and made his choice with eyes open. *See id.* I would reverse and remand for a new trial.

IMBER and THORNTON, JJ., join.