Cite as 2019 Ark. App. 398

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CR–18–524

| | |
|---|---|
| JOHN DUNN<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered:** September 18, 2019<br><br>APPEAL FROM THE CLARK COUNTY CIRCUIT COURT<br>[NO. 10CR-14-63]<br><br>HONORABLE GREGORY L. VARDAMAN, JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant John Dunn was found guilty of simultaneous possession of drugs and firearms, criminal attempt to manufacture methamphetamine, use or possession of paraphernalia to manufacture methamphetamine, and possession of a controlled substance (methamphetamine) by a Clark County Circuit Court jury. He was sentenced to an aggregate term of forty years' imprisonment. He argues on appeal that the trial court erred and abused its discretion in (1) finding that appellant had made an effective waiver of his right to counsel and could proceed pro se and (2) finding that appellant was competent to conduct trial proceedings pro se. We affirm.[1]

Appellant was arrested on July 9, 2014, and charged with simultaneous possession of

---

[1]This is the second time this case has been before us. We initially remanded it to settle and supplement the record and ordered rebriefing. *Dunn v. State*, 2019 Ark. App. 196, 575 S.W.3d 413.

drugs and firearms, criminal attempt to manufacture methamphetamine, use or possession of paraphernalia to manufacture methamphetamine, and possession of a controlled substance (methamphetamine). Appellant's omnibus hearing took place on October 14, before Judge Robert McCallum. At that time, Timothy Beckham, appellant's appointed attorney, informed the court that he anticipated filing a motion for mental evaluation of appellant in terms of appellant's fitness to proceed. The motion was filed the same day. An order for a criminal-responsibility examination was filed on October 20. A forensic evaluation by Dr. Paul Deyoub took place on January 21, 2015. Dr. Deyoub submitted his findings to the court on April 2, in which he found that appellant suffers from personality disorder not otherwise specified (301.9) and schizoaffective disorder, bipolar type with delusions (295.70). Dr. Deyoub opined that appellant was unfit to proceed because he was a danger to himself and others and should be committed to the Arkansas State Hospital for treatment and restoration to competency. The court entered a not-fit-to-proceed commitment order on April 14.

On December 22, appellant filed a motion to remove Beckham as his counsel and to proceed pro se; a motion for discovery; and a motion to suppress any letters allegedly written by him, any findings in connection with his involuntary commitment, and all results of mental evaluations and any other tests by Dr. Kara Belue. Appellant also filed a motion to dismiss the not-fit-to proceed order, alleging that it was his attorney, not he, who was not fit to proceed, along with a supporting memorandum. Appellant filed another motion to dismiss and supporting memorandum on December 30, seeking to have the charges against him dismissed. Appellant filed other motions during this time, including a motion

to admit exculpatory evidence, a motion to admit evidence, and a motion for habeas corpus.

Appellant underwent a forensic evaluation performed by Dr. Michael J. Simon on February 2 and February 4, 2016. The court received the complete report on February 10. Dr. Simon opined that at the time of the examination, (1) appellant did not lack the capacity to understand the proceedings against him and assist effectively in his own defense, and (2) appellant did not have a mental disease or a mental defect. He also opined that at the time of the alleged conduct, appellant did not (1) have a mental disease or mental defect, (2) lack the capacity to appreciate the criminality of his conduct, or (3) lack the capacity to conform his conduct to the requirements of the law. Dr. Simon concluded that appellant was competent to stand trial. The court entered an order setting a motion hearing for March 8, 2016, and a jury trial for the week of March 14.

At the March 8 hearing, appellant advised the court that he was trying to obtain Brandon Crawford as his private counsel and that he had the money to do so. Based on this information, the court agreed to move appellant's case to the week of April 18 and to send the information to both Beckham and Crawford. On April 1, appellant filed a motion for a change of venue or the appointment of a special judge, citing a conflict due to his filing a lawsuit against several people, including Judge McCallum.

A hearing regarding appellant's fitness to proceed took place on April 4. At the beginning of the hearing, the court advised appellant it had been informed that Crawford was not going to represent appellant and appellant acknowledged he had received a declination letter from Crawford. Dr. Simon testified that he spent several hours with appellant while performing the forensic examination and that there was no clear evidence

3

that appellant suffered from a mental disease or defect. He acknowledged that appellant's history showed at least two psychotic episodes (when appellant was admitted involuntarily to Levi Hospital and when appellant wrote several letters to the court while incarcerated),[2] but such was not the case at the time of the evaluation and, in his opinion, when the crime was committed. On cross, Dr. Simon stated that he stood by his conclusion that appellant was fit to proceed and that appellant appreciated the criminality of his conduct at the time of the offense.

Dr. Katharine Sunder testified that she is a postdoctoral fellow at the Arkansas State Hospital. She stated that she reevaluated appellant after he was ordered confined at the hospital. She said that she interviewed appellant for two hours and described her conclusion that appellant was unfit to proceed as a "tough call." She stated that the biggest deficit she saw in appellant was his ability to effectively assist counsel, which she acknowledged was primarily around the delusional or psychotic beliefs that she felt were present at the time of her mental evaluation.[3]

Dr. Kara Belue testified that she is a psychiatrist with the Arkansas State Hospital and that she was the treating physician for appellant when he was there. She stated that appellant was not prescribed any psychotropic medication while he was there because he refused to take it. She testified that she performed a psychiatric evaluation of appellant the day he arrived. She stated that she did not agree with Dr. Deyoub's diagnosis of paranoid

---

[2]Appellant denied writing the letters and they contained no signature.

[3]Appellant had professed to having worked for FEMA, Homeland Security, City of Malvern Police Department, and the Arkansas State Police, which all turned out to be true.

4

personality disorder. She said that her belief that appellant should be medicated was based on his hostility toward her. Dr. Belue testified that once she found out that appellant had worked at all the places and in the capacities he claimed to, she could not trust Dr. Deyoub's diagnosis of psychosis.

Before the hearing concluded, appellant asked the court when he would be able to seek legal counsel. The court advised him that he could make phone calls and have family members contact attorneys on his behalf.

A review hearing took place on May 6. At that time, the court asked appellant how he wanted to proceed with regard to counsel. Appellant answered that he had fired Beckham, that he had a friend contacting attorneys on his behalf, and that he had also been sending postcards to potential attorneys. Appellant stated that he anticipated having an attorney to represent him "within the next week." He also informed the court that he was not in need of a public defender and that he "wasn't real[lly] truthful on anything that [he] wrote because [he] was thinking that they would try to seize [his] assets and stuff." However, he stated that he did have money in the bank to hire an attorney. The court stated that it would enter an order allowing Beckham to step aside from the case. The court entered an order on May 6, finding that appellant was fit to proceed. An order was entered on May 9, relieving Beckham as counsel, based on appellant's "oral motion to proceed pro se."[4]

At the review hearing on May 10, appellant informed the court that he had not hired

---

[4]There is no indication in the record that appellant made an oral motion to proceed pro se during this hearing.

an attorney but that his friend had been working "feverishly" trying to find one.  The court

set the case for trial on June 20 with a review date of June 7.

At the June 7 review hearing, appellant reported that he had unsuccessfully tried to

retain several attorneys to represent him.  Therefore, he stated that he would have to proceed

pro se at "at this time."  The following pertinent colloquy took place:[5]

> THE COURT:  And do you understand that there's the requirement that you proceed
> as a lawyer, if you represent yourself, you're held to the same standards
> as a lawyer with regard to procedure.
>
> APPELLANT:  The rules of procedure, yes sir.
>
> THE COURT: [S]ubstantive law, and rules of evidence?
>
> APPELLANT:   Yes, sir.
>
> THE COURT:  Okay. The matter is set for trial the week of June 20th.  There are
> other things that I need to advise you of.

Appellant's jury trial did not take place on June 20 as originally anticipated.

On June 29 Judge McCallum wrote a letter to Chief Justice Brill asking to recuse

from appellant's case based on a conflict caused by appellant's naming him in a federal

lawsuit.  Our supreme court issued an order on July 6 granting Judge McCallum's request

and assigning Judge Tom Cooper to appellant's case.

Appellant's pretrial hearing took place on July 19 before Judge Cooper.  Appellant

informed the court that he was still unable to find an attorney to represent him.  When

appellant expressed his lack of knowledge as to how to issue subpoenas, the court stated that

it would prefer appellant allow the court to appoint him an attorney. Appellant declined the

---

[5]All quotes and colloquies are as abstracted by appellant.

court's offer to appoint one of the local public defenders for his case, insisting that he would represent himself. However, the court did appoint Janice Williams to be present on the day of appellant's trial to assist him if he had any questions. When the court's discussion turned to the selection of the jury, appellant responded that he had "done a jury selection before."

Appellant filed a motion for subpoena on August 3. On August 16, he filed a motion for immediate healthcare and a petition for prescribed medications. In the motion, he stated that he has had a chronic severe mental impairment, ADD/ADHD, that requires treatment. He stated that in his present unmedicated state, he had severe social and industrial impairment and that his interpersonal skills prevented him from working with others and his psychiatric impairment prevented him from focusing on and completing work tasks or working with his legal assistant. He spoke of other health issues, not relevant to this appeal, and asked that he be granted an immediate appointment with Dr. Shawn Purifoy. The court held a hearing on appellant's motion on August 22. At the time of the hearing, the court indicated that it had appointed Winston C. Mathis to assist appellant at trial. At the hearing, the following colloquy took place:

THE COURT: You're still wanting to represent yourself?

APPELLANT: Yes, sir.

THE COURT: Have you been interacting with your attorney?

APPELLANT: We've been trying, but Mr. Mathis said with my attention deficit, it's hard to. So --.

THE COURT: Mr. Mathis, have you been working with him?

MR. MATHIS: Yes, Your Honor. I've been presenting him quite a bit of law in a short amount of time, but it's difficult because he can't focus on the issues. Indeed, I'm concerned about his mental state of being in

7

both senses, his ability to assist, and at the time of the event. My exposure to this case indicates that he may not have had the mens rea necessary to commit the crime.

THE COURT: Were you sent to the state hospital for a forensic evaluation previously in this case?

APPELLANT: Yes, sir.

THE COURT: How long did they keep you?

APPELLANT: Six months.

THE COURT: You understand what Mr. Mathis just stated on the record?

APPELLANT: Yes.

THE COURT: I'm going to order a forensic mental evaluation for you, and the doctors will look and see if you can assist a lawyer or have the ability to represent yourself, which is about the same. It's the same issue.

APPELLANT: Oh, I've already --. They've already ruled on that. Dr. Simon, he's one of those guys that I petition – subpoenaed to Court. But I'm completely competent and understand what's going on. It's just hard for me to focus on trying to learn new things with my attention problems.

THE COURT: I've read some of your pleadings. I have great concern about your ability to represent yourself or to assist an attorney in defending you. I'm going to follow that recommendation. If Mr. Mathis did not ask for it, I was going to do it myself as far as fitness to proceed. But I'm going to order both aspects, fitness and culpability.

APPELLANT: Okay.

THE COURT: Once they return an evaluation, we'll put your case back on the docket.

APPELLANT: Okay. So I'm not going to have trial on the 25th?

THE COURT: I just don't feel you have the ability at this point to represent yourself or assist an attorney.

8

APPELLANT: Well, if I could get my medication, maybe he could take over first chair.

THE COURT: Absolutely. Maybe they could get your medication regulated and then you can be in a position where you could assist an attorney.

APPELLANT: That's why I had these documents here, because they got me on an insurance program through Arcare and the Ryan White Program out of Texarkana that will pay for my medications, but I just needed to get to my primary care physician who prescribes me my medication.

THE COURT: Hopefully, they'll get you some help there.

MR. MATHIS: I would just ask that all his medical documents that we can get our hands on be sent with him. Like his prescription for the medicine that he needs to function. That's why he filed a motion, because he has to have this medicine to be able to handle this situation.

THE COURT: I would agree.

APPELLANT: Right. And it is methamphetamine. I mean, you had said that it wasn't, but that's what it says, methamphetamine, 5 milligram, 60 tablets.

THE COURT: I mean, therein is part of the concern that I had about your ability to represent yourself. You say you have a prescription for methamphetamine?

APPELLANT: Yes, sir. Would you like to see it?

MR. MATHIS: I can bring it up there.

THE COURT: A doctor in this state prescribed you methamphetamine?

APPELLANT: Yes, sir.

MR. MATHIS: And a pharmacy in this state filled it.

THE COURT: I think this just verifies my belief already. I'm going to order a forensic mental evaluation of both aspects. I hope they'll get your medication regulated and you'll be able to assist your attorney in your defense.

9

The court filed an order for a criminal-responsibility examination of appellant on August 29. The examination was performed by Dr. Lacey C. Willett Matthews on December 13. The report was submitted on January 30, 2017. In the report, Dr. Matthews opined that (1) appellant did not manifest symptoms of a substantially impairing mental disease or defect at the time of the exam, (2) appellant had the capacity to understand the proceedings against him and the capacity to effectively assist his attorney in his own defense, (3) appellant did not display any substantial impairing symptoms of a mental disease or defect at the time of the alleged offense, (4) appellant's state of mind surrounding the time of the alleged offense was not of such a nature as to render him incapable of appreciating the criminality of his conduct, (5) appellant's state of mind surrounding the time of the offense was not of such a nature as to render him incapable of conforming his conduct to the requirements of the law, and (6) appellant was capable of forming the necessary mental state required as an element of the offenses charged.

Appellant filed a motion for immediate healthcare and prescribed medications as well as a motion for Judge Cooper to recuse on March 14, 2017. In the motion to recuse, appellant alleged that he and Judge Cooper had a verbal encounter in June 2014 and that he currently had a civil action against Judge Cooper that was in arbitration.

A review hearing took place on May 11. When questioned by the court about his ability to find an attorney, appellant responded that he had not talked to any attorneys willing to "defend [him] the way [he] wanted to be defended." However, he indicated that he wanted to talk to Ralph Ohm about defending him. Gregg Parrish of the Arkansas Public Defender Commission was present at this hearing and testified that he had received an

application from appellant for professional services for funds to secure Dr. Diner as an expert witness. However, Parrish stated that he subsequently wrote appellant and informed him that such funds would not be proper because appellant was not relying on mental disease or defect as an argument. He further stated that "w[ith] all due respect to Mr. Dunn, if there's an attorney besides Mr. Ohm that he wants to tell the Court and the Court wants to order me to consider appointing that attorney, I would certainly consider that based upon these circumstances." Mr. Parrish stated that it was his personal opinion that defendants do not get to pick their own attorneys but that he would be willing to break that rule if appellant had an attorney in mind. He also stated that he was willing to pay Ohm's expenses and time. The court acknowledged that it and Mr. Parrish were doing things they normally did not do to try to get appellant an attorney. Before the hearing concluded, the court informed appellant that Judge Vardaman was the new judge in that district and that the case would usually be assigned to him, but there was a potential conflict because he had met with appellant briefly about appellant's case. Appellant stated on the record that he wished to waive the conflict. At that point, the following colloquy took place:

THE COURT: He will handle your case from now on. I can't speak for Judge Vardaman, but I think he is also going to talk to you about letting him appoint someone to represent you. I just can't say how strongly I feel about you representing yourself is not in your best interest.

APPELLANT: Right. I understand that. I just haven't found anybody that wants to defend me. I waive the conflict of interest, Judge.

Our supreme court granted Judge Cooper's request to terminate his assignment to appellant's case in an order filed on May 12, 2017.

A review hearing before Judge Vardaman took place on May 23. At the beginning of the hearing, the State stressed that it did not believe that "there's been any inquiry or challenge as to whether or not there's been a knowing and intelligent waiver" by appellant. The State further stated the following:

> Mr. Dunn is entitled to a fair trial, we want to make sure that he gets a fair trial. He's entitled to counsel. He can waive that right. But I think under the circumstances, the Court cannot be satisfied that there's been a knowing and intelligent waiver. And I think a failure to make that determination now is simply going to mean that we're going to be trying this case again in a couple of years. And so the State believes that under the circumstances, Mr. Dunn's waiver of right to counsel is subject to challenge. I believe the Court should appoint the Public Defender Commission to formally represent him. And the State would further ask that he be evaluated if indeed he wants to represent himself so that the Court can be satisfied that he can intelligently waive that constitutional right.

The court agreed and the following pertinent colloquy took place:

> THE COURT: I made a cursory review of the file in preparation for today just to see what was – we needed to get through. And everything that Mr. Turner said jumped right out to me as well. On two occasions, you have made it abundantly clear that without certain medication –
>
> APPELLANT: Methamphetamine.
>
> THE COURT: That you cannot adequately represent yourself. Now, I know that most likely Judge – Judge McCallum is the one that allowed you to act pro se – Have a seat, Mr. Dunn, it's okay. Or if it was Judge Cooper, but I believe that they went over what we call the Mayo factors. That's Mayo v. State. That's an Arkansas Supreme Court case from 1991 that says there are three things that we have to have. First, your request to represent yourself has to be made timely and unequivocally. And I think you made it timely and you certainly made it unequivocally. I'm going to jump to No. 3, there's not conduct that would prevent the fair and orderly acquisition of the issues. You haven't been disruptive, and you haven't shown me anything that in my limited time on the case, and I haven't been made aware of anything that says you disrupt these proceedings or that you've done something that would delay. So I think you clearly meet those first two prongs. However, with those two motions that you filed yourself on August 16, 2016 and March 14, 2017 and Mr.

12

Turner, I will take judicial notice that those have been filed of record – you said, and I'll summarize, just that you could not adequately represent yourself without certain medication that you are not receiving. Are you currently, today, receiving that medication?

APPELLANT: I don't have anything for my attention deficit. And – Mr. Mathis can testify that I'm like a tweaker when I'm not on the medication. And I've taken it since 1976. So. . .

THE COURT: That leads us to one of the prongs of Mayo, and that is that you have to knowingly and intelligently waive your right to counsel. Now, that's a personal right, and you can waive it. Okay? But unless you do so knowingly and intelligently, I can't let you represent – I don't believe I can let you represent yourself. Okay? The State's made a very good argument. So since you are representing yourself, you know, I'd like for you to presently just speak on that issue and only that issue. Okay? Go ahead and come to the podium, Mr. Dunn.

APPELLANT: Yes, sir. Like I've tried to say, I've had some smart aleck remarks and moving furniture over here the other day. "You're the one that wants to be an attorney." I said, "I never said that I wanted to be an attorney." I have not found an attorney anywhere in the state of Arkansas that wanted to defend me. I'm a cop; I've been working undercover narcotics. I talked to my chief of police right before I got arrested. I talked to an attorney friend of mine over in Hot Springs right before I got arrested. I had cleared all this up with them, and they all knew exactly what I was doing. I wasn't out –

.  .  .  .

THE COURT: Mr. Dunn hang on just a second. And again, I – you'll get your day in court. Either as your own counsel or with appointed counsel or hired counsel. But just to the issue of whether or not you can knowingly and intelligently waive your right to an attorney, that's what I want you to speak on and only that. Okay?

APPELLANT: I can. Because, you know, they keep drumming up this report by Paul Deyoub that was done off of some previous stuff from the Levi Hospital. I've since had another doctor come and say that everything that he wrote was no good. Here's my thing: I've been lied to [by] so many judicial officers and attorneys. I have tried to retain counsel. I had an attorney that was a friend of mine in Hot Springs. I had talked to Judge Ohm the other day. I have a friend that taught me how to fly when I was 11 years old named Morris Gist, and I was

13

going to see today if I could get with him to get another of these papers for the – because somebody told me he's supposed to be doing public defense in Hot Springs.

THE COURT: Mr. Gist is a public defender in Garland County. Okay. I'll certainly ask Mr. Mathis if he wants to contact Mr. Gist on your behalf and see if he'll come talk to you. That's fine.

APPELLANT: That's what I would like to do.

THE COURT: Let me tell you, Mr. Dunn, the longer we go, the more we delay. You said this the other day in court. You've been in jail for 35 months. We've been having tests and more mental evaluations. This thing really needs to get going. I agree with the State; on two occasions you have stated in writing, filed of record, that you cannot adequately represent yourself. And because you have said it, because you admit that yourself, I don't know that you can knowingly and intelligently waive your right to counsel. As a matter of fact, I know that Judge Cooper went over all of the dangers of representing yourself. I don't necessarily have to do that again. Okay?

APPELLANT: I understand.

THE COURT: But I've been in Judge Cooper['] courtroom and he'll tell you, you know, all the jury trials he's had, you know, when you represent yourself, you have a fool for a client. Okay?

APPELLANT: Right. I understand that.

THE COURT: And so I'm really at a point where I have to say it: I just don't think you can knowingly and intelligently waive your right to counsel. I want the question answered first. Okay? Because standing here in front of you, you seem lucid. But without your medication, I don't know what you can and can't do.

APPELLANT: Well, I just can't pay attention.

THE COURT: Okay. Well, that's something you need to do in a courtroom.

APPELLANT: But nobody wants to have me on methamphetamine even though I've been on it since [']76 for some reason.

THE COURT: I'm going to on that issue, I'm going to take that under advisement. I think I'm going to have to see exactly what I can and can't do. I

14

may have to send you for an evaluation to determine whether or not you can represent yourself. Because that's, it's a personal right and you can waive it, but I want you to be able to do that knowingly and intelligent. Go ahead, you need to talk to Mr. Mathis.

. . . .

THE COURT: Mr. Dunn, this is what I'm going to do presently, okay, you have previously been found to be able to represent yourself. I am going to make a judicial decision to withdraw that. I'm going to appoint Mr. Mathis to represent you going forward today for now.

APPELLANT: Yes, sir.

THE COURT: All right. I believe what you're saying is you want to see Dr. Diner.

APPELLANT: I would like to get my medication, so I can work with him.

THE COURT: Okay. I'm going to ask you to sit down.

APPELLANT: Yes, sir.

THE COURT: I'm not going to allow you to represent yourself right now.

APPELLANT: All right.

THE COURT: Mr. Mathis, I believe you've been appointed as stand-by counsel; is that correct?

MR. MATHIS: No, not necessarily. I was his assistant. I guess that's what you would call – I'm not sure of the correct term.

THE COURT: Well, tell me what you understand so that I can come up with the correct term.

MR. MATHIS: I was to give him advice, answer any questions he had.

APPELLANT: About legal –

Mr. Mathis: Yeah, legal questions –

THE COURT: Is the state paying your bill?

MR. MATHIS: Yes.

15

THE COURT: Then I'm going to appoint you as counsel today. Until we resolve the question of whether or not Mr. Dunn can knowingly and intelligently waive his right to counsel and represent himself, which I'm not convinced of. Mr. Dunn, understand, you have that right. But I don't know if you can make that choice yourself. All right.

MR. MATHIS: Well, I don't have any choice but to move that he get psychologically evaluated by somebody that's not associated with the Arkansas State Hospital. Bradley Diner is an excellent psychiatrist.

THE COURT: [I]s there any objection by the State to that oral motion?

MR. TURNER: No, sir. That's fine with the State.

THE COURT: Mr. Dunn, we're going to have, potentially, Dr. Diner do an independent evaluation of you. I hate to delay these proceedings, but I've been on them for a week. I think this is the best course of action, because, again, you stated yourself you don't think you can adequately represent yourself given you can't pay attention.

APPELLANT: Right.

THE COURT: Mr. Dunn, you're represented by counsel, so let your attorney speak. Okay? And we discussed that, Mr. Dunn. Mr. Mathis will contact Mr. Gist for you. If Mr. Gist wants to take over – but he can't do it as a public defender down here.

APPELLANT: Right.

THE COURT: It would have to be as private counsel. But I'm going to grant the motion for independent mental evaluation. No objection by the State. Clint, you've got the doctor in mind? Mr. Mathis, you have the doctor in mind?

MR. MATHIS: Bradley Diner.

The court entered an order on May 23, appointing Mathis as appellant's attorney. A psychiatric evaluation was performed by Dr. Bradley Diner on June 13. Dr. Diner opined that appellant was fit to proceed and that he fully understood the charges against him and the range of consequences. Dr. Diner stated that there was nothing about appellant's

16

personality disorder[6] that prevented appellant from understanding the criminality of his conduct or caused him to lack the ability to conform his conduct to the requirements of the law. Dr. Diner stated that there was nothing in appellant's medical history that showed he suffered from ADHD. He also stated that appellant presented no indication that he could not stay focused and organized or work rationally with his attorney. Mathis filed a motion on August 7, 2017, pursuant to *Faretta v. California*,[7] requesting to be relieved as counsel.

A review hearing took place on August 15. The court found that appellant was fit to proceed and capable of assisting in his own defense. When asked if he wanted to represent himself, the following colloquy took place:

APPELLANT: Well, I would like to have a defense attorney, but I have not been outside, you know, and it's my understanding that everything's changed in law now since I was a cop, because used to you were given a bond because they wanted you to appear in court. But I was a police officer a state trooper, there's no reason that I'm not going to appear in court. And, you know, I can't afford $150,000 even on my best da[y]. I don't understand why I can't go out so I can find me an attorney.

. . . .

THE COURT: Just be careful. And so if you're not going to proceed pro se, then Mr. Mathis needs to speak on your behalf in court.

APPELLANT: Well, I thought – he and I agreed that he was fired and all that.

THE COURT: I haven't signed any order. Again, there's been a motion filed August the 7th, 2017, by Mr. Mathis indicating you wanted to proceed pro se.

APPELLANT: Right.

---

[6]Dr. Diner's impressions of appellant included personality disorder with narcissistic antisocial and paranoid traits.

[7]422 U.S. 806 (1975).

THE COURT: So do you wish to represent yourself?

APPELLANT: Absolutely.

. . . .

THE COURT: All right. I need to go over all potential rights you may have in this matter. Understand you certainly have the right to remain silent, the right to counsel, you have the right to an attorney. You've been represented through this whole case.

APPELLANT: I didn't understand. I thought you meant I had the right to be heard in court, those kind of rights.

THE COURT: You certainly do. You have the right to testify if you want to. The rules of criminal procedure and the rules of evidence will be enforced by this court, and you should be aware of those. What it means, Mr. Dunn, is that I will treat you exactly the same as Mr. Turner, Mr. Mathis, or any other attorney that appears in this court. It's hard enough for attorneys to you know know what the procedure is and have to research books. I've seen some of your work in this file. You appear to have at least a very good knowledge. However, it's not the same as having the experience in the courtroom. So you understand that through this whole matter, the rules of evidence, the rules of criminal procedure, I will hold you to those as I would any other attorney?

APPELLANT: Right. I understand that even if I have evidence to prove that I'm not guilty that you will try to prove that I'm guilty by court rules.

THE COURT: It's not a matter of just having evidence, Mr. Dunn; it's a matter of knowing how to have that evidence admitted into courtroom, laying foundations, exceptions to hearsay, all of those things that we spend years studying as attorneys. Do you understand that?

APPELLANT: Yeah, I understand, but it doesn't look right to me that if someone doesn't have – that you would try to trick someone in court --- try to find somebody guilty of a crime when you know that they haven't committed a crime and you've known for --.

THE COURT: Let me make sure that we understand each other. We are not trying your case today. I'm asking you do you understand that there is a procedure in this courtroom? I can't help you. If you try to admit

evidence, for example, and Mr. Turner objects and it's a legitimate objection, I'll sustain it. It won't be anything against you but if you fail to follow the proper procedure or the rules of evidence for admitting evidence or anything like that, do you understand I will hold you to the same standard?

APPELLANT: I understand he is going to try to convict me of a crime when I –.

THE COURT: Let me finish. Do you, Mr. Dunn, do you understand I will hold you to the same standard as I hold that attorney? You understand that?

APPELLANT: Yeah. If he's held to standards. But I haven't seen those standards yet.

THE COURT: Okay. Once again, the wheels of communication are grinding to a halt here. I want you to understand completely. Do you understand that I will hold you to the same standard or the Rules of Criminal Procedure of the State of Arkansas and the Rules of Evidence of the State of Arkansas, as I hold any attorney, if you represent yourself?

APPELLANT: Yes.

THE COURT: Thank you. That the Court will not assist you, and that a working knowledge of court procedure, the rules of evidence, conducting a trial and a hearing are essential? Do you understand that?

APPELLANT: Yes.

THE COURT: Again, it's not just what we learn in law school, Mr. Dunn; it's what we learn through the course of being attorneys. You understand that? So I can't assist you once we get started if you represent yourself.

APPELLANT: Yes.

THE COURT: You understand that?

APPELLANT: Yes.

THE COURT: That if motions or objections are not timely and correctly made, they will not be considered by the court. You understand that?

APPELLANT: Yes.

19

THE COURT: That the decision to represent yourself is not a wise one. I am absolutely required to tell you that. You ever heard the expression that a –

APPELLANT: I've heard it.

THE COURT: An attorney who has himself as a client has a fool for a client?

APPELLANT: Yes, sir.

THE COURT: You have spoken to legal counsel concerning these matters and the hazards, or you've at least been afforded that right. Mr. Mathis has been with you, I think, for quite a while now.

APPELLANT: Yes.

THE COURT: Have you gone over this with him? Have you asked him any questions?

APPELLANT: I have seen him three times since I've been in jail.

MR. MATHIS: Three times since you've –

THE COURT: You have the right to counsel. You understand that, right?

APPELLANT: Right. But with the few minutes that I've seen him – I haven't really got to speak to anybody for any extended periods.

THE COURT: You understand how that might be a hazard to you going forward in a trial?

APPELLANT: Oh, everything in Clark County's a hazard to me.

THE COURT: I know you've been over this, Mr. Dunn, but how far did you go in school? Did you graduate high school?

APPELLANT: Oh, absolutely.

THE COURT: You have any college?

APPELLANT: Yes, sir.

THE COURT: All right. Do you have any other vocational training of any sort?

20

APPELLANT: Yes, sir.

THE COURT: You've been to the police academy or the state trooper academy?

APPELLANT: Yes, sir.

THE COURT: So you believe you have enough education, understanding that you could proceed in this matter as your own attorney.

APPELLANT: As an attorney? No. Representing myself; yes, sir.

THE COURT: I don't, other than this matter, I doubt you have any court experience.

APPELLANT: Yes.

THE COURT: Though you, again, from the pleadings I've read, you at least have some basic knowledge of legal proceedings.

APPELLANT: As a police officer, I've –.

THE COURT: All right. Are there any other issues or pitfalls the State would like to ask me to inquire of Mr. Dunn?

MR. TURNER: No, sir. We may ask for some recitals during the trial or prior to.

THE COURT: Mr. Dunn, you understand that, you know, during trial, one side's going to put on their case, the other side will put on their case? And the way things go, you'll get the chance to cross-examine witnesses that the State calls and call your own witnesses. There won't be any outbursts. There won't be any shaking your head or making little verbal asides.

APPELLANT: Yes, sir.

THE COURT: You know, and anything that's done like that will be treated harshly by the Court.

APPELLANT: Right.

THE COURT: You are to act professional at all times. You understand?

APPELLANT: Yes, sir.

21

. . . .

THE COURT: Okay. Mr. Dunn, then I'll ask you: You voluntarily wish to represent yourself in the trial of this matter?

APPELLANT: Yes.

THE COURT: Okay. I find that you have voluntarily, knowingly, intelligently waived your right to counsel and that you are competent to represent yourself, even though I think it's a very bad idea.

APPELLANT: Yeah.

THE COURT: Mr. Mathis, I am going to ask you to be stand-by counsel, please. I understand your concern, how – and I will certainly entertain the interim nature of compensation in this case because of what I've asked you to do. Mr. Dun[n], remember this, though, we get into the middle of this trial and things start going south for you –.

APPELLANT: Oh, they've already went as far south –

THE COURT: I understand.

APPELLANT: I lost my two dogs. They murdered a K9.

THE COURT: I understand. I'm not going to suddenly let you tag Mr. Mathis into the trial. What Mr. Mathis is going to be is he's going to be here for you to ask questions, things of that nature. But I am not going to let him tag in and be your attorney all of the sudden. You want to try this case on your own, that's what I'm going to let you do. I think you voluntarily waived your right to counsel and knowing intelligent waive[r] as well, and that you're at least competent to do so.

APPELLANT: Yes, sir.

The court entered an order on August 28 relieving Mathis as appellant's counsel. However, the court ordered him to be stand-by counsel for appellant.

At the review hearing on September 6, appellant informed the court that he had recently learned from his father that he had over $10,000 in his bank account and was not indigent. He stated that he was trying to obtain private counsel but that he had been unable

22

to do so. However, he said that he was not prepared for trial and wanted to reach out to a couple of attorneys to see if they would accept his case. The court agreed that appellant probably should not represent himself and asked how much time he thought he needed to find an attorney, to which he responded that he "hoped it doesn't take [him] another week to get somebody to get started on this." Mathis made an oral ruling to be relieved, and the count granted that request. Mathis subsequently filed a motion to be relived on September 13. The court entered an order the next day relieving him.

In the review hearing held on October 10, appellant informed the court that he had still been unable to hire an attorney. Upon motion by the State, the court reappointed Mathis as appellant's stand-by counsel. The court stated that appellant would proceed pro se unless he wanted Mathis to represent him. Appellant responded that he would like to hire an attorney and that he could afford to hire one but that he had been unable to do so.

A pretrial hearing took place on November 7. At this hearing, appellant informed the court that all the attorneys he contacted had declined to represent him. The court told appellant that the trial would continue as scheduled, and appellant responded that he guessed he would proceed pro se. When asked if he wanted Mathis to be his lead counsel, he responded no. At the pretrial hearing on November 15, the court reiterated to appellant that the rules of evidence and criminal procedure would apply at all phases of the trial. It also reminded him that objections had to be timely made and responded to in the correct way. Appellant inquired about voir dire, and the court informed him how it was to take place. Appellant subsequently indicated that he was prepared to go to trial.

23

Appellant's jury trial took place on November 16. Appellant conducted all phases of the trial with little or no help from Mathis. He was found guilty of the charges against him and sentenced to forty years' imprisonment. His sentencing order was filed on November 16. He filed a timely notice of appeal on December 11, 2017. This appeal followed.

As his first point on appeal, appellant contends that the trial court erred in its finding that he had made an effective waiver of his right to counsel and could proceed pro se. The Sixth Amendment to the United States Constitution, made obligatory on the states by the Due Process Clause of the Fourteenth Amendment, guarantees an accused the right to have the assistance of counsel for his defense.[8] Article 2, section 10, of the Arkansas Constitution provides that an accused in a criminal prosecution has the right to be heard by himself and his counsel.[9] No sentence involving loss of liberty can be imposed where there has been a denial of counsel.[10] On the other hand, a criminal defendant has a right to represent himself at trial where his waiver of the right to counsel is knowingly and intelligently made.[11]

A defendant may proceed pro se in a criminal case when (1) the request to waive the right to counsel is unequivocal and timely asserted, (2) there has been a knowing and intelligent waiver of the right to counsel, and (3) the defendant has not engaged in conduct that would prevent the fair and orderly exposition of the issues.[12] Our standard of review

---

[8]*Gideon v. Wainwright*, 372 U.S. 335, 342–44 (1963).

[9]*Barnes v. State*, 258 Ark. 565, 568, 528 S.W.2d 370, 373 (1975).

[10]*White v. State*, 277 Ark. 429, 432, 642 S.W.2d 304, 306 (1982).

[11]*Faretta v. California*, 422 U.S. 806 (1975).

[12]*Bledsoe v. State*, 337 Ark. 403, 406, 989 S.W.2d 510, 512 (1999).

is whether the trial court's finding that the waiver of rights was knowingly and intelligently made was clearly against the preponderance of the evidence.[13] Appellant argues that the court erred in finding that he effectively waived his right to counsel.

Determining whether an intelligent waiver of the right to counsel has been made depends in each case on the particular facts and circumstances, including the background, the experience, and the conduct of the accused.[14] Every reasonable presumption must be indulged against the waiver of fundamental constitutional rights.[15] A specific warning of the dangers and disadvantages of self-representation, or a record showing that the defendant possessed such required knowledge from other sources, is required to establish the validity of a waiver.[16] The burden is on the State to show that an accused voluntarily and intelligently waived his fundamental right to the assistance of counsel.[17] The "constitutional minimum" for determining whether a waiver was knowing and intelligent is that the accused be made sufficiently aware of his right to have counsel present and of the possible consequences of a decision to forgo the aid of counsel.[18]

---

[13]*Pierce v. State*, 362 Ark. 491, 497, 209 S.W.3d 364, 367 (2005).

[14]*Bledsoe, supra.*

[15]*Id.*

[16]*Id.*

[17]*Hatfield v. State*, 346 Ark. 319, 57 S.W.3d 696 (2001).

[18]*Id.*

Appellant contends that his waiver was not unequivocal because he continuously stressed his intentions to hire private counsel. Here, the record is replete with colloquies between the court and appellant as it pertained to his wanting to proceed pro se or keep appointed counsel. Appellant was appointed at least three different attorneys, and each time he stated that he did not want the appointed counsel to represent him and would prefer to represent himself. He insisted that he was not indigent and could afford to pay for his own attorney, but he could not find one who would accept his case. Although he was given several continuances to find an attorney willing to accept his case, he was unable to do so. When asked if he would allow Mathis to represent him, he responded no, he would proceed pro se. Based on these facts, we cannot say that his waiver was not unequivocal.

Appellant contends that his waiver was not knowing or voluntary because when the court "made sure to inform [him] of the dangers of self-representation, this was done while [appellant] still hoped to retain counsel." This argument is without merit. The court fulfilled its duties under our statutory law to warn appellant of the dangers associated with self-representation at several of the review hearings held during the pendency of this case. It also notified him of his right to counsel. Appellant was questioned about his educational background as well as his understanding of the legal process. There were at least two different times that the court did not feel appellant could make a knowing and intelligent waiver of his right to counsel and sent him for mental evaluations. Each time, it was determined that appellant did not suffer from a mental disease or defect and was fit to proceed. Therefore, his waiver was knowingly and intelligently made.

He also argues that he did not effectively waive his right to counsel because he engaged in conduct that prevented the fair and orderly exposition of the issues. He cites instances that predated his jury trial; for example, the mental evaluations, his federal lawsuits against multiple defendants, his statements about being unable to pay attention without his medication. However, this is not the type of conduct necessary to prevent the fair and orderly exposition of the issues. Appellant was present at his jury trial and participated at every stage. He was not disruptive, he did not talk over witnesses, and he did not otherwise abuse the dignity of the courtroom. Accordingly, the third requirement was met.

To the extent appellant argues that the assistance of his standby counsel was insubstantial, that becomes an issue only with an involuntary waiver of counsel. Such is not the case here. We have already found that appellant made a knowing and intelligent waiver of his right to counsel.

Appellant argues as his second point on appeal that he was not competent to conduct trial proceedings pro se. He concedes that he passed psychological evaluations indicating he could aid in his own defense; however, he states that he was found incompetent by two doctors and that there was never an exam conducted to see if he was competent enough to conduct his own defense. In *Indiana v. Edwards*,[19] the United States Supreme Court added an element to the standards required for a waiver of counsel—mental competence to conduct trial proceedings pro se. In *Edwards*, the Court found that a defendant may be mentally competent to stand trial but mentally incompetent to act as his own counsel.[20]

---

[19]554 U.S. 164 (2008).

[20]*Id.*

The Court approved the actions of the State of Indiana in forcing Edwards to use an attorney despite his repeated requests for self-representation.[21] In deciding whether Edwards's Sixth Amendment rights had been violated, the Court held that the rights previously set forth in *Faretta*[22] were not absolute.[23] The *Edwards* Court held that the United States Constitution "permits states to insist upon representation by counsel for those who suffer from *severe* mental illness to the point where they are not competent to conduct trial proceedings by themselves."[24] The ruling in *Edwards* made the test for an effective waiver of counsel a four-prong conjunctive test instead of a three-prong conjunctive test by adding a pro se litigant's mental competency to conduct the trial proceedings.

Although appellant was initially found unfit to proceed, he had at least three findings of competency by three different doctors subsequent to the initial findings of unfitness. None of the doctors found that he could not concentrate or pay attention. Dr. Diner found just the opposite in his report to the court. Additionally, none of the subsequent evaluations revealed that appellant suffered from a mental disease or defect that would impair his ability to understand the charges against him, limit his ability to know right from wrong, or limit his ability to conform his actions. In fact, evidence showed that appellant understood the charges against him and understood the roles of all the parties involved. Other than the

---

[21]*Id*.

[22]*Supra*.

[23]*Id*. at 171.

[24]*Id*. at 178 (emphasis added).

initial findings of unfitness, no other doctors found appellant suffered from a mental disease or defect, let alone a severe one that would prevent him from conducting proceedings by himself. Additionally, the evidence shows that he was, in fact, able to conduct such proceedings with little or no assistance from the stand-by counsel. Therefore, the court did not err in finding appellant competent to proceed pro se.

Affirmed.

KLAPPENBACH and HIXSON, JJ., agree.

*Misty A. Grady*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Adam Jackson*, Ass't Att'y Gen., for appellee.